735 So.2d 826 (1999)
SUCCESSION OF Hilda Tate DESHOTELS.
Jacqueline Deshotels Cashen Appellant.
No. 98-1467.
Court of Appeal of Louisiana, Third Circuit.
May 12, 1999.
*827 John Henri Pucheu, Eunice, for Jacquelyn Deshotel Cashen.
Jonathan C. Vidrine, Ville Platte, for Loretta Deshotel.
Before DECUIR, SULLIVAN, and GREMILLION, Judges.
SULLIVAN, Judge.
Jacqueline Deshotels Cashen appeals the dismissal on summary judgment of her opposition to the probate of her mother's will. For the following reasons, we affirm.

Facts and Procedural History
Hilda Tate Deshotels died on August 16, 1997 at the age of eighty-four. Mrs. Deshotels was survived by her adopted daughter, Jacqueline, and her biological daughter, Loretta A. Deshotels. On January 9, 1997, Mrs. Deshotels executed a statutory will in which she bequeathed her entire estate, less several items of furniture, to Loretta.
Jacqueline opposed the probate of the will, alleging that Mrs. Deshotels lacked testamentary capacity or, in the alternative, was subjected to undue influence from Loretta. Loretta then filed a motion for summary judgment, attaching as exhibits the depositions of the attorney who prepared the will, the witnesses to the will, and the sitters who cared for Mrs. Deshotels before her death. Jacqueline's opposition to the summary judgment included the depositions of Mrs. Deshotels' doctor and Loretta's roommate, who drove Mrs. Deshotels to her attorney's office for an appointment about the will. Near the close of business on the day before the summary judgment hearing, Jacqueline also filed into the record and faxed to opposing counsel the affidavits of three of Mrs. Deshotels' relatives.
The trial court refused to consider the affidavits filed by Jacqueline, finding that they were served on opposing counsel without proper notice to respond. After reviewing the depositions, the trial court concluded there was no genuine issue of material fact that Jacqueline would not be able to produce the clear and convincing evidence required to invalidate the will. On appeal, Jacqueline assigns as error (1) the trial court's failure to consider the affidavits; (2) the trial court's conclusion that Mrs. Deshotels' doctor's opinion as to her mental capacity had no factual foundation; (3) the trial court's failure to recognize that the deposition evidence revealed a genuine issue of material fact; and (4) the trial court's failure to recognize that the affidavits, together with the depositions, created a genuine issue of material fact.

Opinion

Standard of Review
Appellate courts review summary judgments de novo, applying the same criteria as the trial court in deciding whether or not summary judgment should be granted. Schroeder v. Board of Supervisors, 591 So.2d 342 (La.1991).
La.Code Civ.P. art. 966(A)(2) provides: "The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action, except those disallowed by Article 969. The procedure is favored and shall be construed to accomplish these ends." A motion for summary judgment "shall be rendered forthwith if the pleadings, depositions, *828 answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law." La.Code Civ.P. art. 966(B).

Deposition Testimony
The testament in question was prepared by Thomas Fuselier, an attorney practicing in Mamou, Louisiana. In his deposition, Mr. Fuselier stated that he had known Mrs. Deshotels all of his life. He had also performed legal work for Mrs. Deshotels and her late husband, Darby, including a donation of their principal residence to Loretta before Mr. Deshotels' death. At the time of that donation, both Mr. and Mrs. Deshotels told Mr. Fuselier of their desire to provide more for their natural daughter, Loretta, than for Jacqueline, whom "they felt they had given a lot to." On other occasions (unrelated to either the donation or the will), Mrs. Deshotels discussed with Mr. Fuselier her desire to favor Loretta over Jacqueline. Mrs. Deshotels explained that she and her husband had taken in Jacqueline, who was the child of Mr. Deshotels' brother, when Jacqueline's mother abandoned her. Mrs. Deshotels believed that they had provided Jacqueline with a good life and home, but that Jacqueline was unappreciative and caused disturbances in the family. Mr. Fuselier recalled Mrs. Deshotels stating that she felt she had done enough for Jacqueline and it was time to take care of Loretta. Mr. Fuselier was aware that Jacqueline and Loretta had received cash gifts from their parents, including a gift of $30,000 to each daughter in one year.
Mr. Fuselier met with Mrs. Deshotels twice about her will. At the first visit, Mrs. Deshotels was accompanied by Mary Ayo, Loretta's roommate. Ms. Ayo, who appeared to be friendly with Mrs. Deshotels, attended the meeting, but did not participate when they discussed the substance of the will. After Mrs. Deshotels told Mr. Fuselier that she wanted to leave her entire estate to Loretta, except the specific bequests, Mr. Fuselier suggested that Jacqueline might challenge the will. Mrs. Deshotels replied that she "wouldn't be around then," "that's where she wanted it to go," and "so be it." Even though he anticipated that the will might be challenged, Mr. Fuselier saw no need for a medical opinion about Mrs. Deshotels' capacity.
Mrs. Deshotels returned to Mr. Fuselier's office a few days later to sign the will. Mr. Fuselier first questioned Mrs. Deshotels about where she was, what she was doing, and whether she understood the consequences of her actions. He asked her to repeat her instructions about the will and whether she had changed her mind. Again, she replied that she wanted everything to go to Loretta. Mr. Fuselier was not surprised about the contents of the will because Mrs. Deshotels had previously related the same intentions to him. Mr. Fuselier admitted that Mrs. Deshotels was not as sharp as she once was, but he, nonetheless, believed her to be competent and in full control of her faculties. When asked whether anyone suggested that either Loretta or Ms. Ayo tried to influence Mrs. Deshotels, he responded that the will appeared to be Mrs. Deshotels' decision.
The will was witnessed by two legal secretaries, Leisa Deshotel and Maria Yeager, and by the sitter who drove Mrs. Deshotels to the law office that day, Veniter Joyce Duplechain. Both secretaries agreed that Mrs. Deshotels responded appropriately when asked about whether she knew what day it was and why she was at the office. According to Leisa Deshotel, Mrs. Deshotels appeared insulted that Mr. Fuselier asked her those questions.
Ms. Duplechain testified that Mr. Fuselier read the will aloud as Mrs. Deshotels followed with a copy. He then asked if this was what she wanted, and she answered that it was and that no changes would be necessary. Upon leaving Mr. Fuselier's office, Ms. Duplechain took Mrs. Deshotels to her sister's home. There, Mrs. Deshotels remarked about the will, "I *829 know Jackie won't be happy." She also commented that Jacqueline had a husband who could give her "the good life," but that Loretta was not married and would have to work for everything until she retired. Ms. Duplechain believed that Mrs. Deshotels understood what she was doing that day.
Dr. Wayne LaHaye was Mrs. Deshotels' family physician as well as her nephew. Dr. LaHaye had diagnosed his aunt with moderate Alzheimer's disease in February of 1996, but he observed its symptoms as early as 1994. He also treated her for generalized arteriosclerotic vascular disease. Dr. LaHaye described Alzheimer's as an incurable disease with a gradual but progressive worsening of symptoms. Its classic symptoms are confusion, forgetfulness, and the development of a placid personality. He believed that even patients in the moderate stage of Alzheimer's would suffer from judgment problems, notwithstanding their ability to appear lucid for short periods of time. Based upon his diagnosis and his observation of Mrs. Deshotels' mental capacity over the years, he did not believe that she would have had the capacity to execute a will in January of 1997. Dr. LaHaye recalled speaking with Loretta about her mother's mental capacity on the telephone, but he did not note this conversation in the medical records. Dr. LaHaye's last visit with his aunt before she signed her will was in October of 1996.
In the last year of Mrs. Deshotels' life, sitters attended to her around the clock. The sitters' testimony painted a picture of someone who functioned well, but only in an environment totally planned by others. They agreed that Mrs. Deshotels required twenty-four hour care, mainly because of her inability to prepare her own food, but that she could dress, bathe, and clothe herself without assistance and could engage in intelligent conversation. They all described instances of forgetfulness, but in varying degrees.
Ms. Duplechain stated that between July of 1996 and April of 1997 she did not observe any confusion or memory loss other than Mrs. Deshotels frequently misplacing her purse. According to Ms. Duplechain, Mrs. Deshotels did not decline mentally until Easter of 1997, after which she lost interest in her handiwork, began stuttering, and experienced more memory problems. Rita Shillow, Mrs. Deshotels' housekeeper for thirty-three years, said that Mrs. Deshotels needed someone to prepare her meals and often got confused as to "who was who," but that she carried on normal conversations with visitors and "seemed mentally okay." Rose Guillory said Mrs. Deshotels always knew where she was and who she was talking to, but that she could not make long range plans.
Anna Tate testified that Mrs. Deshotels had trouble following instructions, could not remember her schedule from day to day, and often repeated conversations. Ms. Tate did state that Mrs. Deshotels never confused her sitters, could answer her telephone, and could carry on a conversation, at least in 1996. Bertie Guillory testified that Mrs. Deshotels was always aware of her surroundings, but that she had short term memory problems, such as forgetting what she had for lunch or who had visited that day, misplacing money and jewelry, and being unable to follow her favorite television programs. Jacqueline testified that her mother could not remember recent events such as who had visited her, what she had for lunch, and where she was told she was being driven.
Bertie Guillory also believed that Mrs. Deshotels was controlled by Loretta, Ms. Ayo, and Mrs. Deshotels' sister, Hazel. She testified that she heard Loretta "say bad things" about Jacqueline and that Mrs. Deshotels would "put Jackie down" after Loretta had visited for the weekend. Bertie Guillory also heard Mrs. Deshotels complain that Jacqueline had not visited on several occasions when Jacqueline had. However, Bertie Guillory was not working for Mrs. Deshotels in January of 1997, *830 having left in August of 1996 to undergo major surgery.
Loretta, who works as the social services director for a nursing home, testified that her mother was forgetful, but that she did not have the typical dementia of other Alzheimer's patients. She denied disparaging Jacqueline to Mrs. Deshotels, but she admitted that her Aunt Hazel does favor her over Jacqueline. Ms. Ayo, Loretta's roommate, drove Mrs. Deshotels to an appointment about the will at Loretta's request. At Mr. Fuselier's office, Ms. Ayo heard Mrs. Deshotels say that she had done a lot for Jacqueline, but that Jacqueline had turned her back on her. From Mr. Fuselier's responses, she assumed that Mrs. Deshotels had expressed these sentiments to him on other occasions. Ms. Ayo described Loretta as her best friend and companion. They purchased a home, a vehicle, and a camper together, and Loretta is the beneficiary on Ms. Ayo's life insurance policy.

Affidavits
Jacqueline also proffered the affidavits of three of Mrs. Deshotels' relatives. Millard, Flo, and Lear Deshotels, who regularly visited with the testator, stated that their aunt could not recall recent activities, confused family members, and repeated conversations. Millard recalled that his aunt discussed selling some property with him without remembering that she had already donated that land to Loretta. Flo once observed Mrs. Deshotels crying because she was supposed to have signed a paper that caused her daughters to fight, but she did not remember signing anything. Lear stated that in January of 1997 he observed his aunt near tears because she had to "go to the lawyer's office" and "sign some papers" and that "[w]hen Jackie finds out, she won't be happy." Lear had the impression that his aunt was being pressured to sign whatever the lawyer had prepared.
We agree with Jacqueline that the trial court should have considered these affidavits. Loretta's counsel stipulated that the affidavits were properly served by facsimile transmission; counsel's objection concerned only their timeliness. La.Code Civ.P. art. 966(B) provides in part: "The motion for summary judgment and supporting affidavits shall be served at least ten days before the time specified for the hearing. The adverse party may serve opposing affidavits prior to the date of the hearing." (Emphasis added.) In Vardaman v. Baker Center, Inc., 96-2611, p. 5 (La.App. 1 Cir. 3/13/98); 711 So.2d 727, 730, the court stated, albeit in another context, that "the obvious purpose of this sequence is to give the party against whom the motion is brought the information needed to oppose it." Although we find that the affidavits were timely, for the following reasons, we disagree with Jacqueline's argument that they create a genuine issue of material fact.

Testamentary Capacity
To have the capacity to donate inter vivos or mortis causa, a person must be able "to comprehend generally the nature and consequences" of his action. La. Civ.Code art. 1477. "Capacity to donate mortis causa must exist at the time the testator executes the testament." La.Civ. Code art. 1471. A person challenging the capacity of a testator must prove lack of capacity at the time of the testament by clear and convincing evidence. La.Civ. Code art. 1482.
Jacqueline argues that the trial court erred in concluding that Dr. LaHaye's opinion had no factual basis and that the depositions and affidavits created a genuine issue of material fact as to Mrs. Deshotels' mental capacity. Although we disagree with the trial court's characterization of Dr. LaHaye's testimony, we, nonetheless, find Dr. LaHaye's opinion and the affidavits insufficient to defeat summary judgment, given the testimony of those present when the will was signed.
Concerning the role of medical testimony in a challenge to a will, the court in *831 Succession of Braud, 94-668, p. 5 (La.App. 4 Cir. 11/17/94); 646 So.2d 1168, 1171, writ denied, 95-383 (La.3/30/95); 651 So.2d 841 (emphasis added), stated:
The only witnesses present when the will was actually executed all testified unequivocally that [the testator] did have the necessary mental capacity to execute the will on the day the will was actually prepared. None of [the opponent's] evidence rebuts this testimony. The caselaw [sic] is clear that proof of the presence of a mentally-debilitating condition at the approximate time that the will was executed is insufficient to prove lack of testamentary capacity at the time the will was executed by clear and convincing evidence, especially in light of conflicting evidence of the decedent's capacity at the actual time the will was executed. Even the fact that the decedent had previously been interdicted was insufficient to prove lack of testamentary capacity in [Succession of Cole, 618 So.2d 554 (La.App. 4 Cir.1993)].
Succession of Christensen, 94-263 (La. App. 1 Cir. 12/22/94); 649 So.2d 23, writ denied sub nom. Succession of McGhee, 95-234 (La.4/7/95); 652 So.2d 1346, is remarkably similar to the instant case in that (1) the testator suffered from moderate Alzheimer's disease, (2) several sitters offered conflicting testimony about her capacity, but (3) the witnesses who had contact with the testator on the day she wrote her will indicated that she understood and appreciated the consequences of what she was doing. Under those circumstances, the court in Christensen found the opponents to the will failed to meet the clear and convincing standard, given the presumption in favor of capacity.
Concerning the burden of proof in summary judgment procedure, La.Code Civ.P. art. 966(C)(2) provides:
The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.

(Emphasis added.) At trial, Jacqueline will have to prove that Mrs. Deshotels lacked capacity when the will was executed by clear and convincing evidence. Although she has presented evidence that Mrs. Deshotels suffered a moderate form of Alzheimer's disease, she has not come forward with evidence that this condition prevented her mother from understanding the "nature and consequences" of her action. The affidavits of the Deshotels relatives only confirm the sitters' testimony that Mrs. Deshotels was forgetful and repeated conversations; they do not conflict with the testimony that Mrs. Deshotels understood what she was doing when she executed her will. Indeed, her statement that "[Jackie] won't be happy" indicates that she understood the consequences of her decision. On this record, we find that summary judgment was properly granted as to Mrs. Deshotels' capacity to make her will.

Undue Influence
A donation inter vivos or mortis causa shall be declared null upon proof that it was the product of influence by the donee or another person "that so impaired the volition of the donor as to substitute the volition of the donee or other person for the volition of the donor." La.Civ. Code art. 1479. The burden of proof for one challenging a donation based on "undue influence" is found in La.Civ.Code art. 1483:

*832 A person who challenges a donation because of fraud, duress, or undue influence, must prove it by clear and convincing evidence. However, if, at the time the donation was made or the testament executed, a relationship of confidence existed between the donor and the wrongdoer and the wrongdoer was not then related to the donor by affinity, consanguinity or adoption, the person who challenges the donation need only prove the fraud, duress, or undue influence by a preponderance of the evidence.
Prior to the adoption of the above articles, evidence of undue influence was admissible only to show testamentary incapacity or mental weakness. Succession of Hamiter, 519 So.2d 341 (La.App. 2 Cir.), writ denied, 521 So.2d 1170 (La.1988). "[T]he addition of Civil Code article 1479 in 1991 created a new cause of action. ... By adopting that article the legislature has specifically recognized the cause of undue influence, in addition to incapacity, as a separate basis for nullifying a testamentary disposition." Succession of Dowling, 93-1902, p. 15 (La.App. 4 Cir. 2/25/94); 633 So.2d 846, 855 (emphasis added).
Comment (b) to Article 1479 provides in part:
[E]veryone is more or less swayed by associations with other persons, so this Article attempts to describe the kind of influence that would cause the invalidity of a gift or disposition. Physical coercion and duress clearly fall within the proscription of the previous Article. The more subtle influences, such as creating resentment toward a natural object of a testator's bounty by false statements, may constitute the kind of influence that is reprobated by this Article, but will still call for evaluation by the trier of fact. Since the ways of influencing another person are infinite, the definition given in this Article is used in an attempt to place a limit on the kind of influence that is deemed offensive. Mere advice, or persuasion, or kindness and assistance, should not constitute influence that would destroy the free agency of a donor and substitute someone else's volition for his own.
Comment (d) of the same article addresses when the influence must be present: "It is implicit in this Article that the influence must be operative at the time of the execution of the inter vivos donation or testament. Obviously, it should not be necessary that the acts themselves be done at that time, or that the person exercising the pressure be present then." (Emphasis added.)
The record established that Mrs. Deshotels lived alone but with the help of sitters at the time of her will, with Loretta and Ms. Ayo visiting every other weekend. The only evidence suggesting that Mrs. Deshotels was influenced by Loretta or Ms. Ayo was found in the deposition of Bertie Guillory, who had stopped working for Mrs. Deshotels approximately five months before the will was executed. Although Ms. Ayo was present at a meeting about the will, Mr. Fuselier testified that she did not participate in discussing it and that the substance of the will appeared to be Mrs. Deshotels' decision. Mr. Fuselier saw no reason to question the will, in part because Mrs. Deshotels had told him in previous conversations that she intended to favor Loretta over Jacqueline. Mrs. Deshotels had also expressed the same intentions to others. Again, we find no genuine issue of material fact that Jacqueline will not be able to produce the clear and convincing evidence necessary to invalidate the will.

Decree
For the above reasons, the judgment of the trial court is affirmed at appellant's cost.
AFFIRMED.