857 So.2d 240 (2003)
Mary DEROVANESIAN, Appellant,
v.
Jack DEROVANESIAN, et al., Appellees.
No. 3D02-929.
District Court of Appeal of Florida, Third District.
August 27, 2003.
*241 Berman & Kean and Richard E. Berman (Fort Lauderdale); Bunnell, Woulfe, Kirshbaum, Keller, McIntyre & Gregoire and Nancy Gregoire (Fort Lauderdale), for appellant.
Todd Derovanesian, Jr.; Martin Derovanesian, in proper persons.
Before SCHWARTZ, C.J., and LEVY and WELLS, JJ.
SCHWARTZ, Chief Judge.
Mary Derovanesian, the only daughter of Dr. Zevart Manoyian who died at 83 on December 24, 1999, appeals from a probate judgment which invalidated an amended trust and pour-over will executed by Dr. Manoyian on August 18, 1999, as the product of undue influence asserted by the appellant upon the decedent. The 1999 will and trust effected a significant change from similar instruments Dr. Manoyian executed in 1990, which had divided her 2.3 million dollar estate equally among Mary and her three brothers, by leaving the brothers only about $75,000.00 each with Mary to receive the rest of the estate. We reverse because of our determination that the record does not, as is required to set aside a properly executed will, make it "clearly [appear] that the free use and exercise of the testator's sound mind in executing [her] will was in fact prevented by deception, undue influence, or other means." In re Carpenter's Estate, 253 So.2d 697, 704 (Fla.1971). Indeed no cognizable showing to that effect was made at all.
There is no question that there was no direct evidence that Mary exercised any influence, let alone undue, upon her mother in making the disposition in her favor. To the contrary, the appellees relied below and here only upon what may be called Carpenter inferences to that effect which arise from evidence that Mary played a part in securing the attorney who drew the 1999 instruments, was present when they were executed, and (along with many others) was aware of their contents both before and after their execution. We find, however, that those inferences were more than overcome by Mary's reasonable explanation for this involvementthat she merely responded to the wishes of her mother with whom, alone among the siblings, she was living during the decedent's last illness, andmuch more significantlyby uncontradicted direct evidence that the 1999 documents were the product of her own free and independent will. In more or less ascending order of importance:
1. There was uncontroverted evidence that Dr. Manoyian, a remarkable person who was one of the first female physicians in Florida, was an indomitable, fiercely independent individual, who was peculiarly *242 unsusceptible to the influence of others, and who retained that individuality and strength of mind (and even practiced medicine) after she was diagnosed with terminal stomach cancer and up to perhaps only a few weeks before her death. Compare, In re Reid's Estate, 138 So.2d 342 (Fla. 3d DCA 1962), overruled in part on other grounds, In re Carpenter's Estate, 253 So.2d 697 (Fla.1971).
2. Direct, again unimpeached, testimony of the attorneys who drew the 1999 documents was adduced that they correctly reflected an exercise of her uninfluenced desire as to the disposition of her estate. See Langford v. McCormick, 552 So.2d 964 (Fla. 1st DCA 1989), review denied, 562 So.2d 346 (Fla.1990).[1]
3. What we regard as most significant of all, there was undisputed testimony from a variety of witnesses, including two of the doctor's closest friends, Mr. and Mrs. Pilafian,[2] another friend who acted as her handyman, Cal Atkins, and even one of *243 the appellees thatwell before she signed the 1999 documents and, in the case of the Pilafians, well before Mary had anything to do with the matterthe decedent had not only expressed her desire to do what the instruments did, favor Mary over her three brothers, but that she had very good reasons for doing so: Mary needed the money and her sons, each of them an independently wealthy professional man, did not. As Mr. Pilafian said:
Q. Did you ever talk to Dr. Manoyian after 1997 about what she intended to do with her estate?
A. It would come up about every time we would meet. I represented her in real estate ventures and she would also mention that she wanted to make up an estate. The primary reason was I want to make sure that my daughter Mary is well taken care of.
Q. Did she tell you about whether she wanted to leave any money to her boys versus whether she wanted to leave any money to Mary?
A. At one time when she told me, she says, I don't care about taxes. She says, let everybody pay their own taxes. They're all millionaires in their own rights.
* * *
The face of this evidence leaves us in no doubt that the disposition complained of was, in legal contemplation, not the result of anything but the decedent's own wishes.
Of the numerous Florida cases which might be cited in support of this conclusion, Langford, 552 So.2d at 964, is among the most persuasive. Reversing a trial court's finding of undue influence, the court said:
One asserting that a testamentary disposition was the product of undue influence bears a heavy burden. The "undue influence must amount to over persuasion, duress, force, coercion or artful or fraudulent contrivances to such a degree that there is a destruction of free agency and willpower." [Emphasis added.] Jordan v. Noll, 423 So.2d 368, 370 (Fla. 1st DCA 1982), citing Williamson v. Kirby, 379 So.2d 693. Hence, the crucial issue is whether the record before *244 us contains evidence legally sufficient to support a finding that Anava McCormick's "free agency and willpower" were destroyed by the actions of appellant and other members of the Langford family at the time she made the September will.
Even though Anava's brothers or niece may have "planted the seed" for her change in disposition of her estate from that set forth in the March will, proof of that fact alone does not satisfy the burden of proof. The evidence must also show that, having so planted the seed, the brothers and niece exercised sufficient influence over her mind that Anava was deprived of her own free will when making the will. Several undisputed facts in the record establish that Anava was not so influenced when she met her Alabama attorney, Mark Murphy, and told him what to put in her will.
Apparently, the trial judge gave scant consideration and probative value to the uncontradicted testimony of attorney Murphy, although the findings in the final judgment indicate the judge accepted the credibility of this witness. Yet, Murphy's testimony provided the most important objective evidence probative of Anava's testamentary capacity and ability to exercise her will free of outside influence at the time she made the September will. In lengthy discussion with her prior to preparing the will, he found her to be mentally astute and alert even though physically weak and infirm. She manifested a clear grasp of what she wanted to do and gave a thoughtful explanation as to why she wanted to make the property disposition she made. She made specific devises to her husband of all property acquired during the marriage and owned by them jointly. Further, she explained that she wanted her brother Robert rather than Murray to serve as executor. [e.s.]
* * *
Paraphrasing the holding in Tarsagian v. Watt, 402 So.2d at 472, this court is not free to treat lightly the decedent's manifested testamentary intent, whether she leaves her estate entirely to her husband, or divides it among her husband and her blood family; merely because her choice happens to bestow a substantial portion of her estate on her brothers and their family members rather than on her husband, whom she undoubtedly loved dearly, does not mean that her choice was not freely made, and unless the evidence shows that she has been precluded from freely exercising that choice, her wishes are to be respected. The evidence in the case before us falls substantially short of clearly indicating that Anava McCormick's "free agency and willpower" were destroyed by undue influence exerted by appellant and other Langford family members, and we are unwilling to thwart the dispositional intent she so clearly evidenced to her attorney and in her will.

Langford, 552 So.2d at 968-969. See In re Estate of Flohl, 764 So.2d 802 (Fla. 2d DCA 2000); Pavlides v. Roussis, 764 So.2d 769 (Fla. 2d DCA 2000); Raimi v. Furlong, 702 So.2d 1273 (Fla. 3d DCA 1997), review denied, 717 So.2d 531 (Fla.1998); Mulato v. Mulato, 705 So.2d 57 (Fla. 4th DCA 1997), review denied, 717 So.2d 535 (Fla.1998); Ballard v. Ballard, 549 So.2d 1176 (Fla. 2d DCA 1989); Jordan v. Noll, 423 So.2d 368 (Fla. 1st DCA 1982), pet. for review denied, 430 So.2d 451 (Fla.1983); Tarsagian v. Watt, 402 So.2d 471 (Fla. 3d DCA 1981); Williamson v. Kirby, 379 So.2d 693 (Fla. 2d DCA 1980); see also, Kendrick-Owens v. Clanton, 271 Ga. 731, *245 732-733, 524 S.E.2d 237, 238 (1999)[3]; In re Estate of Farr, 49 P.3d 415, 430 (Kan. 2002)[4]; In re Raynolds' Estate, 132 N.J.Eq. 141, 153-154, 27 A.2d 226, 233-234 (1942), aff'd, 133 N.J.Eq. 344, 32 A.2d 353 (1943)[5]; Estate of Davis, 920 S.W.2d 463, *246 467 (Tex.App.1996).[6] Very telling also are cases from other jurisdictions which involve very similar facts. Thus, in In re Succession of Deshotels, 735 So.2d 826, 832 (La.App. 3 Cir.1999), the court affirmed a summary judgment that no undue influence existed because, in part,
The record established that Mrs. Deshotels lived alone but with the help of sitters at the time of her will, with Loretta and Ms. Ayo visiting every other weekend. The only evidence suggesting that Mrs. Deshotels was influenced by Loretta or Ms. Ayo was found in the deposition of Bertie Guillory, who had stopped working for Mrs. Deshotels approximately five months before the will was executed.
Although Ms. Ayo was present at the meeting about the will, Mr. Fuselier testified that she did not participate in discussing it and that the substance of the will appeared to be Mrs. Deshotels' decision. Mr. Fuselier saw no reason to question the will, in part because Mrs. Deshotels had told him in previous conversations that she intended to favor Loretta over Jacqueline. Mrs. Deshotels had also expressed the same intentions to others. Again, we find no genuine issue of material fact that Jacqueline will not be able to produce the clear and convincing evidence necessary to invalidate the will.
Similarly, in Lowry v. Hamilton, 268 Ga. 373, 489 S.E.2d 827 (1997), the court affirmed a disposition which, like this one, favored an unmarried daughter over her siblings on the following basis:
In a letter to her children, Ms. Wingard explained that she had provided disproportionately for Hamilton because Lowry and her brother were more financially secure than Hamilton, Hamilton needed her financial assistance, and because Hamilton took care of her in the last two years of her life.
* * *
Lowry urges that her mother was operating under mistakes of fact about her children, caused by Hamilton's repeated misrepresentations and omissions regarding *247 her own divorce and the actions of her siblings, and that the serious untruths in light of Ms. Wingard's vulnerable mental and physical state amounted to undue influence. But the record is replete with evidence that Ms. Wingard was of sound mind and strong will during the time she lived with Hamilton and when she made her final decision about the testamentary distribution, making her capable of independently judging the character and conduct of her children. She too had read Hamilton's divorce settlement and was able to make her own assessment of Hamilton's financial situation. Moreover, there was no evidence that Ms. Wingard believed or relied upon any negative statements made by Hamilton or that Hamilton ever asked her mother to change her will or to leave her more than the other children. On the contrary, the evidence is that the unequal distribution was not the result of ill feeling but rather born of rational concern for Hamilton and gratitude for her care.
Lowry, 268 Ga. at 373, 489 S.E.2d at 828, and 268 Ga. at 374-375, 489 S.E.2d at 829. For these reasons, we reverse the judgment below and order that the 1999 will and accompanying trust be admitted to probate.
Reversed and remanded.
NOTES
[1] The testimony of the lawyer, Mr. Baskies, includes the following:

QUESTION: Did Dr. Manoyian want Mary Derovanesian to have half of the Quick and Reilly account outright?
MR. WINTTER: Object to the form. Calls for speculation.
ANSWER: The answer is yes. She expressed to me that Mary should receive one half of the Quick and Reilly account outright free of trust, and exempt from tax.
And I think, ultimately, we loed (sic) to a conclusion that she wanted to keep the account available for herself in case she needed it or at least the income therefrom, but that she did want to leave one half of the account to Mary.
* * *
BY MR. BERMAN:
QUESTION: She told me that she felt that Mary had been supportive of her. She told me that she felt that Mary had done a good job helping manage the Quick and Reilly account.
In fact, she told me that most of the increase in value to that account was directly the responsibility of Mary's investment acumen. She told me that she wanted to benefit her by providing that account to her. She told me that she wanted Mary to be an agent of hers.
* * *
Baskies' associate, Mr. Samuels, stated:
Q. What did she say she wanted to do with the Quick and Reilly account?
A. That she wanted half of the account to pass to Mary directly and the remaining half, along with the other assets that she had, to be split equally among the children.
Q. She said that herself? You heard her say that?
A. I recall Mr. Baskies reviewing the provision of the trust agreement with her which stated that and that is that she was in agreement with those terms.
Q. Was she also in agreement with the fact that half of the Quick and Reilly account was going to pass to Mary without having to pay the taxes on that?
A. I believe that was explained to her by Mr. Baskies and she agreed that that was what she intended.
* * *
[2] James Pilafian testified as follows:

A. Well, she wanted me to make a will, but primarily she wanted to make sure that Mary would be well taken care of.
Q. What, if anything, did she tell you about what she believed the financial condition was of her sons?
A. She told me that she thought that they were all financially well situated and that they were millionaires in their own rights.
* * *
Q. I don't want to misstate anything.
What, if anything, did she tell you about how much of her estate, if at all, that she wanted to leave to Mary?
A. She wanted to leave enough to take care of her, to support her.
Q. Did she quantify that for you?
A. She said that she wanted to make sure that she was well taken care of financially and physically.
* * *
A. She asked me to draw up a simple will and leaveto make sure that her daughter Mary was well taken care of, and that she didn't care how much the boys got because they were millionaires in their own rights.
Q. How many such conversations like that did you have with Dr. Manoyian?
A. Oh, over a period of 10 or 15 years, I would say about, every six months.
Q. Did she say that she didn't want to provide anything for them at all?
A. She said that she didn't care what they got because they were well taken care of, that they were millionaires in their own rights.
Q. Did she tell you how much specifically it would take to take care of Mary well?
A. No, she didn't.
She wanted the bulk of the estate to go to Mary.
Shocky Pilafian gave similar testimony:
Q. Did Dr. Manoyian ever tell you how she wanted to leave her estate?
A. She did.
She discussed it because she didn't know what to do and she said to me in my house that she did not want to leave the boys anything, and she wanted Mary protected.
I said, well, why don't you leave a trust fund or something for the grandchildren, and she said, no. She said, let them take care of their own children. They don't know me and I don't know them.
Q. Do you know when you had the conversations with Dr. Manoyian about her wanting to leave her estate to Mary?
A. That waswell, she died two years ago.
It was maybe a year before or two years before that.
Q. Did Dr. Manoyian say that she wanted to cut out the boys?
A. Yes, she did.
[3] In this regard, no witness testified that they ever heard Kendrick-Owens discuss the issue of changing Alene's will with her. Although there was some evidence that Kendrick-Owens had a domineering personality, and that Alene had diminished mental capacity at some points before and after she executed her will, there was evidence from both Alene's attorney and her long-time physician that at the time Alene executed her will she was lucid and of sound mind. Alene's attorney also stated that he met privately with Alene on two occasions; that on the first occasion, Alene brought a will she had executed in 1989, and explained to him the changes she wanted made to it and the reasons for those changes; and that the second time he met with Alene, it was to go over the new will and execute it. The attorney, who also witnessed the will, testified that he went over the contents of the will with Alene before she signed it. He stated that Alene understood the contents of the will and what she wanted to do and explained the reasons for her testamentary desires to him, to the other witness to the will, and to the person who notarized the will. Alene's attorney also stated that it was his opinion that Alene executed the will freely and voluntarily. The attorney added that Kendrick-Owens never discussed Alene's will with him. The second witness to the will and the notary both testified that they were present when Alene's attorney went over each item of the will; that they heard Alene explain her reasons for the testamentary dispositions; that Alene appeared to be of sound mind; and that Alene appeared to "be doing what she wanted to do."

* * *
[W]e conclude that the evidence is insufficient to show that, at the time Alene executed her will, Kendrick-Owens constrained or coerced Alene into making a will that Alene's judgment told her not to do or that Kendrick-Owens deprived Alene of her free agency and effectively substituted her will for that of Alene.
[4] Undue influence, in order to overcome a testamentary act, must directly affect the testamentary act itself.
[5] For the purpose of argument, it may be conceded that Madeleine Taitt Raynolds brought all her powers of persuasion to bear upon her husband to induce him to prefer her own sons over her stepsons in the testamentary disposition of his estate. And it may be that the testamentary disposition here complained of resulted largely from her entreaties and persuasions. But it does not follow that the influence thus exerted by her was undue. It was not undue unless his will was overcome by hers; unless her will was substituted for his; unless it appears that, without such substitution, a different disposition of his estate would have been made by the testator; in short, unless it appears that the questioned document as her will, not his. He may have submitted to persuasion and succumbed to entreaty, but if he was still free to do otherwise, and if what he did was in the exercise of his free will, even though induced by persuasion and entreaty, it cannot be said to be the result of undue influence. Her arguments may have appealed to his `sense of justice and duty', and his yielding, if he did yield, may as well have been the result of love for his wife as of fear or coercion. Dumont v. Dumont, [46 N.J.Eq. 223, 19 A. 467 (1898)] supra. His two first born had already received substantial inheritances from their mother and maternal grandmother. The father may have thought that the disposition of his estate made by his will would equalize the benefits of inheritance amongst his five children. In fact, as will hereinafter appear, that reason is implicit in the language of the 1922, 1926 and 1931 wills, as the testator therein referred to the fact that Edward and Harold were beneficiaries under the wills of their mother and grandmother. That his two first born had lost their competence need not have been a controlling circumstance in the eyes of the father. They had at least had their inheritance, while that of the others was only in prospect. And in this connection it must be borne in mind that Mrs. Raynolds was testator's wife, and the mother of three of his sons, and that these three were sons of the testator no less than the appellants. Nor does it appear by any of the proofs that without the interference of Mrs. Raynolds, without her entreaty or persuasion, all of which rests in mere inference and conjecture, the disposition of testator's estate would have been different from that provided in his challenged will. In Schuchhardt v. Schuchhardt, [62 N.J. Eq. 710, 49 A. 485 (1901)] supra, it was held that: `When undue influence is claimed to be established by inference from certain facts proved, and, upon all the facts proved, an equally justifiable inference may be drawn that the will executed was what testator would have made under the circumstances, the burden on contestants is not supported.'
[6] In reviewing the record before us, we are not without a reasonable explanation for the devise made by Ruby. Indeed, two of the testator's sisters, as well as other witnesses stated that Ruby was a very strong-willed woman, and was deeply hurt over the actions of Eddie and David. Therefore, we may not consider the unequal division among her children as an unnatural disposition, or as any evidence of undue influence, and we are left to answer whether the record contains any evidence that the devise is one which would not have been made but for the arguable influence.

Even if the daughters' conversations with Ruby about Eddie and David, and their conversations with her about the will, were sufficient to establish that an influence was in fact exerted, the record is devoid of any supporting evidence that those conversations caused Ruby to change her will. Indulging the inference that the conversations were initiated by the daughters, and in those conversations the daughters dwelled upon the fact that Eddie and David went against Ruby's wishes, took things from her, and ultimately had no contact with her, there is still no evidence from which we may conclude those discussions became undue influence or that those discussions solely caused her to change her will.