937 So.2d 437 (2006)
SUCCESSION OF Jack BERMAN.
No. 2005-CA-0641.
Court of Appeal of Louisiana, Fourth Circuit.
July 26, 2006.
John Henry Gniady, Metairie, LA, for Viola Berman.
Morris B. Phillips, New Orleans, LA, for Samuel Berman.
Steven E. Bain, Steven E. Bain, L.L.C., New Orleans, LA, for Benjamin Berman.
*438 Donald L. Hyatt II, Donald L. Hyatt, II APLC, New Orleans, LA, for Saul Berman.
(Court composed of Judge MICHAEL E. KIRBY, Judge TERRI F. LOVE, Judge DAVID S. GORBATY).
REVERSED
DAVID S. GORBATY, Judge.
Appellants Viola Berman and Samuel Berman appeal a judgment wherein the last will and testament executed by their father, Jack Berman, was found to be invalid. The sole issue on appeal is whether the trial court erred in finding that Viola unduly influenced her father to change his will. For the following reasons, we reverse.

FACTS:
Jack Berman[1] died testate on August 21, 2001. His wife, Violet, predeceased him by one year, thus leaving his six children as sole legatees. Jack's estate consisted primarily of a family home on Delachaise Street, a business, and a building at 226 Decatur Street from which the business operated.
In 1983, Jack asked Rene Lehmann, an attorney with whom he had consulted previously, to prepare partnership papers for his business, Jack's Metal Arts, making two of his sons, Saul and Benjamin, partners with him. Saul and Benjamin had worked with their father in the shop since they were young, and unlike their brothers, continued to work in and learn the business into adulthood. Jack also asked Mr. Lehmann to prepare wills for him and his wife, Violet.
The will eventually executed by Jack on September 15, 1983, left the family home to his wife, Violet, the business to Saul and Benjamin, and the residual estate to all six children in equal shares. The will recognized the usufruct in favor of Violet, and named Viola as executrix. The building at 226 Decatur was not named in any special bequest and, therefore, formed a part of the residual estate.
In 1991, Jack again contacted Mr. Lehmann to prepare new wills for Jack and Violet. According to Mr. Lehmann, he had had no professional contact with Jack from 1983 until that time. After meeting with Jack, Mr. Lehmann prepared a draft will for him wherein Jack bequeathed the family home to Violet, his partnership interest to Saul and Benjamin, the Decatur building in a trust entitled "The Jack Berman Testamentary Trust," and his residual estate to Samuel, Viola, Saul, Bernard and Benjamin. Viola and Saul were named as co-trustees of the trust, and Viola was named as executrix, with Saul to serve in her stead. Jack disinherited his son, Nathan, for non-communication with his father. However, that will was never executed. Instead, Jack executed a new will on September 30, 1991. Mr. Lehmann also prepared a document giving Saul power-of-attorney, which was executed on September 26, 1991.[2]
The 1991 will again left the family home to Violet, Jack's partnership interest in the business to Saul and Benjamin, the Decatur building to Saul and Benjamin in equal shares, and his residual estate to Samuel, Viola, Saul, Bernard and Benjamin. The will made no provisions for a testamentary trust. Saul was named as *439 executor, with Viola to serve in his stead. Nathan was disinherited.
According to Mr. Lehmann, he had no further professional contact with Jack after the execution of the will on September 30, 1991.
On April 24, 2000, Mr. Lehmann received an e-mail from Viola requesting a copy of her father's will. She was specifically interested in provisions concerning the Decatur building. Mr. Lehmann replied that he could not comply without written consent from her father. On May 15, 2000, Paula George sent a release signed by Jack for a copy of his 1991 will. Mr. Lehmann complied with the request.
One year later on April 26, 2001, Mr. Lehmann again was contacted by e-mail from Viola in which she reported that her father believed his will to be wrong because he intended to leave the Decatur building to all six of his children. Further, her father wanted her to have power-of-attorney. Mr. Lehmann requested Viola have her father and mother make an appointment to discuss these matters. Viola replied that her mother was now deceased, and had left her half interest in the Decatur building to Saul and Benjamin. Mr. Lehmann suggested that perhaps Saul and Benjamin could renounce their legacy; otherwise, there was nothing that could be done. Viola then told Mr. Lehmann that attorney Paula George had drawn up a new will for Jack, and that Jack had already signed it. Viola asked Mr. Lehmann if he thought the new will was valid. Mr. Lehmann responded that he believed it was, and told Viola that Paula George was a good attorney.
According to Viola, she first asked Ms. George, an acquaintance from synagogue, about her father's desire to change his will. She testified that many times over the years, she had discussed her parents' wishes with them. After her mother's death, she asked Ms. George to help get a copy of her father's will.[3] Ms. George prepared a release for Jack to sign, which was forwarded to Mr. Lehmann. After receiving the will, Viola explained to her father that his will left the Decatur building to Saul and Benjamin. Jack said that was wrong because he intended to leave the Decatur building to all six children. In reference to an e-mail Viola had sent to Mr. Lehmann, she was asked if she believed her father loved her more than his sons. Viola responded no, because her father's intention was to leave his estate to his children equally.
Benjamin Berman testified that his father told him after a meeting with Mr. Lehmann that he was leaving the building to him and Saul. During the last year of his father's life, Jack never mentioned changing his mind. Benjamin claimed that Viola had always treated their father badly, often yelling at him and calling him stupid. Benjamin testified that he had lived with his parents until he was 33 years old. Saul continued to live with them a few years beyond the time he moved out; Viola always lived with her parents.
Saul Berman worked with his father since his teens, and by 1980 was participating fully in the business. He had discussed the contents of Jack's 1991 will with him. He also was aware of a letter sent by Mr. Lehmann to Jack in 2001 explaining changes in the heirship laws. Saul stated that his father was superstitious about death, and did not want to discuss his own demise, so he did not respond to Mr. Lehmann's letter. Saul admitted that he requested his father inform him about any decisions made that affected the business. *440 Saul also claimed that Viola badgered their father.
Following Jack's death, Ms. George filed a petition to probate the 2001 will, and to have Viola appointed executrix in accordance with the will's provisions. One of Viola's first actions was to sell the family home, which had been left to Samuel, Nathan, Bernard and Viola in equal shares. Viola obtained an appraisal of $125,000, and sought to buy the house herself. Benjamin and Samuel opposed the sale claiming that the house had been drastically undervalued. After several court hearings, and additional appraisals and negotiations, the heirs finally agreed to allow Viola to buy the house for $153,000 "as is."
Viola filed additional tableaus of distribution, which were also opposed by at least one of her brothers. Finally, on June 14, 2002, Benjamin filed a Petition to Annul Probated Testament, claiming that the will was not in proper form and that Viola had unduly influenced her father into changing his will. Saul eventually joined Benjamin as a plaintiff.
Following a trial, the court invalidated Jack's 2001 will agreeing with Benjamin and Saul that Viola had indeed exerted undue influence on her father causing him to change his previously executed will.

DISCUSSION:
The only issue on appeal is whether Viola Berman unduly influenced her father into changing his will.
Louisiana Civil Code art. 1479 provides:
A donation inter vivos or mortis causa shall be declared null upon proof that it is the product of influence by the donee or another person that so impaired the volition of the donor as to substitute the volition of the donee or other person for the volition of the donor.
The revision comments explain that the first step in determining undue influence is to ascertain whether the donor had capacity to donate. La. Civ.Code art. 1479, Revision Comments-1991(b). There is nothing in the record before us to indicate that Jack Berman lacked the capacity to make a will. Although there was testimony that Jack was a "people pleaser" and that his physical health began to decline after his wife's death, there was no testimony to indicate his mental capacity was impaired. Indeed, Paula George was of the opinion that "no one could influence Jack Berman. He had a mind of his own, and he knew what he wanted to do, . . . he was going to say what was on his mind and what he wanted to do."
The revision comments further explain that the term "undue influence" is difficult to define. Physical coercion and duress fall within the article's attempted description; however, more subtle influences, such as creating resentment toward a natural object of a testator's bounty by false statements, may constitute the kind of influence that is prohibited. The comments indicate that "[m]ere advice, or persuasion, or kindness and assistance, should not constitute influence that would destroy the free agency of a donor and substitute someone else's volition for his own." Id. The influence is defined "as being that of the donee or some other person in order to avoid a challenge based solely on the workings of the donor's own mind without pressure from someone else. It seems obvious that the influence has to be exercised with the object of procuring a particular gift or bequest." La. Civ.Code art. 1479, Revision Comments-1991(c).
Louisiana Civil Code art. 1483 provides in pertinent part: "A person who challenges a donation because of fraud, duress, or undue influence, must prove it by clear and convincing evidence." Further, the factual findings of the trial court, in will contest cases, are afforded great *441 weight and will not be upset on appeal absent manifest error. Succession of Fellman, 96-1738 (La.App. 4 Cir. 8/6/97), 698 So.2d 477, 480; Succession of Armstrong, 93-2385 (La.App. 4 Cir. 4/28/94), 636 So.2d 1109, 1111.
The trial court herein issued reasons for judgment in which it considered the following facts to be clear and convincing evidence of undue influence upon Jack Berman by his daughter, Viola:
1. Prior to the execution of the contested will, Jack had signed two other wills prepared for him by his "regular attorney" Rene Lehmann;
2. Viola attempted to obtain a copy of her father's will from Mr. Lehmann, and eventually engaged the help of Paula George to do so;
3. Viola requested Ms. George draft a new will for her father, and Viola was present at all meetings between Jack and Ms. George;
4. Jack discussed with Ms. George changing the provision of his will regarding ownership of the Decatur Street building; however, Ms. George also changed the provision by which Jack disinherited his son Nathan;
5. The witnesses to the will were procured several weeks prior to signing by someone other than Jack. Further, the witnesses to the will signing saw Ms. George discussing the will with Jack, but did not hear the actual reading of the will prior to signing;
6. Viola requested that Ms. George correct typographical errors contained in the first will prepared by Ms. George and executed by Jack; and
7. There was no dispute that Jack wanted his sons, Benjamin and Saul, to own the business.
"When seeking to annul a donation on the basis of undue influence, it is not sufficient to merely show that the donee exercised some degree of influence over the donor; instead, the challenger must show that the donee's influence was so substantial that the donee substituted his or her volition for that of the donor." Emphasis added. Succession of Gilbert, 37,047 (La.App. 2 Cir. 6/5/03), 850 So.2d 733, 736. "To annul a testamentary disposition based on undue influence, the influence must be operative at the time the testament is executed." Succession of Gilbert, supra; Succession of Deshotels, 98-1467 (La.App. 4 Cir. 5/12/99), 735 So.2d 826.
After a thorough reading of the record, we find that the trial court committed manifest error when it found that Viola exerted undue influence upon Jack, thereby causing him to change his previous testament. The trial court's reasons for its finding simply do not rise to the level required for such a finding, particularly in light of the fact that the evidence in this situation must be clear and convincing.
The trial court found that Viola had influenced her father to change his will because Jack had previously executed two other wills, both prepared by his "regular" attorney, Rene Lehmann. First, it is not unusual for people to change their wills, particularly over a twenty-year period. Second, according to Mr. Lehmann, he was not Jack's "regular" attorney, considering that from approximately 1975 until 1991, they only had business together on three or four occasions. Additionally, the changes Jack made from the 1983 will to the 1991 will were significant, and are indicative of Jack's volition to dispose of his estate as he desired. For example, in 1983 Jack wished to leave the family home to his wife, business only to Saul and Ben, expressly stating that the legacy did not include the building, and his residual estate to all six children in equal shares. He *442 named Viola as his executrix. In August of 1991, Jack had a will prepared for him whereby he bequeathed the family home to his wife, the business to Saul and Benjamin, the building in trust, with Viola and Saul as co-trustees, and the remainder of his estate to five of his children, disinheriting Nathan. However, for some reason not of record, Jack never did execute that will, but, rather, one month later executed a will leaving the family home to his wife, the business to Saul and Benjamin, the building to Saul and Benjamin in equal shares, and his residual estate to five of his children. He again disinherited Nathan, but changed his executor to Saul, then Viola. These changes indicate that Jack had significant issues with his children and that he exercised his right to change his mind about his estate.
The trial court also relied on the fact that Viola enlisted the help of another attorney to get a copy of her father's 1991 will. Clearly, the fact that Viola first contacted Mr. Lehmann on her own assuming that she had some right to see her father's will, indicates her ignorance of the law and attorney/client relationships. The fact that she sought the help of another attorney to get a copy of her father's will is not unusual, nor does it indicate some sinister plot to shut out her siblings. In fact, a whole year passed from Violet's first contact with Mr. Lehmann and the second, suggesting there was no rush to get Jack's will changed.
The trial court also reasoned that because Viola was present at all meetings between Jack and Ms. George and that Ms. George changed provisions in the will regarding Jack's previous disinhersion of his son, Nathan, this was further proof that Violet unduly influenced her father. The record contains ample testimony that Jack was no longer driving himself during the period in question. Additionally, it is clear from the record that Viola drove her father to and attended synagogue with him every weekend. It was at synagogue that the meetings with Ms. George would take place. Further, in the opinion of this Court, the fact that the contested will revoked Jack's previous disinhersion of Nathan bolsters Viola's contention that her father wished to make things equal among his children. There is no testimony of record one way or another concerning why Jack at one point disinherited Nathan, nor is there any testimony to suggest that the father and son did not reconcile at some point. Lastly, jurisprudence suggests that the undue influence must be operative at the time the testament is executed. Succession of Gilbert, supra. There is no evidence that Viola was present when Ms. George was discussing the will with Jack prior to his signing.
The trial court's reliance on the fact that witnesses were procured weeks before the signing and that Jack had no participation in their procurement is misguided. It is not unusual for attorneys such as sole practitioners to arrange for additional persons to be present for will signings, or to arrange for witnesses to attend signings at hospitals, nursing homes, etc. The fact that the testator does not know the witness or did not ask the witness himself to sign is of no moment.
In its reasons for judgment, the trial court pointed out that the witnesses to the will did not hear an actual reading of the will, but they did see Ms. George discussing it with Jack. Louisiana Civil Code art. 1577 does not require that the will be read to the testator, or that the will be read in the presence of the witnesses.[4] The revision *443 comments indicate that the testator himself does not have to read the testament prior to signing. Louisiana courts have frequently observed that ". . . signatures to obligations are not mere ornaments. If a party can read, it behooves him to examine an instrument before signing it; ...." La. Civil Code art. 1577, Revision Comments-1997(f), citing Snell v. Union Sawmill Company 159 La. 604, 105 So. 728 (1925). Although there is testimony that Jack had never mastered the English language and that he had a grade school education at best, there is no evidence that Jack was illiterate and thereby incapable of reading the will. The trial court noted that the witnesses indicated Ms. George at least explained the provisions of the will to Jack prior to his signing.
Viola's request that Ms. George correct typographical errors contained in the will was considered by the trial court as evidence of undue influence. There is no evidence that anything of substance was changed. Saul and Benjamin argue that Ms. George did not discuss with Jack his previous disinhersion of Nathan, yet in the contested will Nathan was not excluded, suggesting that this change was made at Viola's request. Ms. George explained that she knew Saul and Benjamin had received their mother's half of the community-owned partnership interest following her death. Under the terms of Jack's previous will, Saul and Benjamin were to receive Jack's half interest also. Therefore, with instructions from Jack to equalize the distribution of his estate, she prepared the will as it was eventually executed, not as Viola instructed.
The last factor relied on by the trial court was that there was no dispute that Jack wanted his sons, Benjamin and Saul, to own the business. This factor does not determine that Viola unduly influenced Jack. The finding by the trial court indicates that it considered the business and the building from which the business operated to be one entity. To the contrary, in Jack's 1983 will he specifically noted that the business which he left to Saul and Benjamin did not include the building in which the business was housed. Jack changed his mind about the building from his 1983 will to the August 1983 draft will to the 1991 will. Ten years later he changed his mind again.
Accordingly, we find that the trial court was manifestly erroneous in its finding that Viola unduly influenced her father's decision to change his last will and testament. The record is void of any evidence that Viola attempted to gain a particular gift or bequest for herself; rather, it is more likely based on the evidence that she helped to facilitate her father's true wishes, i.e., to distribute his estate in an equitable manner to all six of his children.
For the foregoing reasons, we reverse the judgment of the trial court and reinstate the last will and testament of Jack Berman dated May 13, 2001.
REVERSED.
NOTES
[1] Because all of the parties bear the surname Berman, we shall heretofore refer to the parties by their first names.
[2] It is unclear whether this was a general power-of-attorney for personal matters, or if it was business related.
[3] There is some discrepancy in Viola's testimony, to-wit: she first requested a copy of her father's will in April of 2000; her mother did not die until August of 2000.
[4] The article does require that the notary and witnesses execute a declaration indicating that the testator declared or signified that the instrument is his testament, and that the testator signed the document on each page. The contested will does not contain such a declaration, however, that issue was not raised in the trial court and is, therefore, not before this Court.